[Civil No. 2390.  Filed December 10, 1925.]

[241 Pac. 601.]

# THE ATLANTIC NATIONAL BANK OF BOSTON, a Corporation, Appellant, v. WILLIAM O. MOORE, Appellee.

1. TRIAL—PLAINTIFF ENTITLED TO DIRECTED VERDICT IF EVIDENCE AT CLOSE OF CASE ENTITLES IT TO JUDGMENT.—If at close of case evidence is such as to show plaintiff entitled to judgment, its motion for directed verdict should be granted.

2. PLEDGES—PLEDGEE OF COTTON HELD UNDER EVIDENCE NOT GUILTY OF NEGLIGENCE IN SALE THEREOF.—Cotton was pledged to bank for advances thereon with right in pledgee to sell it on nonpayment of note or on pledgor's failure to meet demand for additional security. *Held*, under evidence, that in handling and disposing of cotton under powers conferred by note pledgee was not negligent, nor wanting in skill and good faith.

3. PLEDGES—PLEDGOR HELD WITHOUT RIGHT TO INSIST ON PLEDGEE'S SALE OF PLEDGED COTTON.—Where cotton was pledged to bank for advances thereon with right in pledgee to sell on nonpayment of note or on pledgor's failure to meet demand for additional security, pledgor could not insist on sale of cotton by pledgee, since, while pledgee was given right to sell at any time or times after notes were due, it was under no legal obligation to do so; pledgor's only right being to pay his debt and take back his property.

4. EVIDENCE—COPY OF NEWS RECORD HELD INADMISSIBLE AS EVIDENCE OF VALUE.—Where testimony did not show where news record got the figures used in its summary of prices of cotton on named date, nor purported to be a republication of prices furnished by brokers, nor was it news of the market of which the business and trading world could take advantage, and was only the asking price for cotton, it was inadmissible as evidence as to value.

---

See (1, 2) 31 **Cyc.**, p. 869, n. 81; 38 **Cyc.**, p. 1574, n. 21.   (3) 31 **Cyc.**, p. 873, n. 35.   (4) 22 **C. J.**, p. 189, n. 23.

1.  See 26 **R. C. L.** 1073.

3.  See 21 **R. C. L.** 689.

4.  Admissibility of newspaper quotations as evidence of value, see note in 16 **L. R. A. (N. S.)** 758.

Admissibility of price list as evidence, see note in 17 **L. R. A.** 851.  See, also, 10 **R. C. L.** 1167.

APPEAL from a judgment of the Superior Court of the County of Maricopa. F. C. Struckmeyer, Judge. Judgment reversed and cause remanded, with directions that judgment be entered for plaintiff.

Messrs. Kibbey, Bennett, Gust, Smith & Lyman and Mr. Harold Baxter, for Appellant.

Mr. Thomas P. Walton, for Appellee.

ROSS, J.—In the fall of 1920, appellee, Moore, then a Salt River Valley grower of Pima cotton, made two consignments of his product, one of two bales and one of five bales, to the People's National Bank of Roxbury, a national bank engaged in business in the city of Boston; the bank accepting the same and the warehouse receipts as a pledge for the repayment of an advancement to Moore of 35 cents per pound on the cotton and for the carriage charges from Phoenix to Providence, Rhode Island, to which place the cotton was consigned. To cover such items Moore gave the bank his four demand notes, for the amounts and upon the dates following: September 18, 1920, $385.70 covering the first consignment; November 30th, $21.63, freight on same; October 6th, $906.50, covering second consignment; January 14, 1921, freight on same $57.79. The notes are collateral form notes, and are the same, except in amounts and dates and description of property pledged. We quote, omitting the portions having no bearing upon the questions involved:

"$385.70.                    Boston, Sept. 18, 1920.
    "On demand, for value received, I promise to pay to the People's National Bank of Roxbury, or order at their banking rooms, 114 Dudley street, Boston, Mass., three hundred eighty-five and 70/100 dollars, with interest at the rate of 8 per centum per annum. I having deposited with said bank as general col-

lateral security for the payment of this and any other liability, direct or indirect, joint or several, of the undersigned already existing or which may hereafter arise in favor of said bank, the following property, viz.: 2 bales Pima cotton, mark W. O. M. gross weight 1102 lbs., No. 6559, No. 6556, with power, on the non-payment of this or any other such liability when due, or at any time or times thereafter, to sell, assign, transfer, and deliver said property or any property added to or substituted for the same or any part hereof, at Brokers' Board or at public auction or private sale, without notice; and the holder hereof may become the purchaser at any such sale. . . . Should the market value of the property hereby or hereafter pledged, depreciate, in the judgment of the holder of this note I hereby agree to deposit satisfactory additional property on demand, so that the market value shall always be at least —— per cent more than the amount of this note.

"Upon failure to comply with any such demand, or upon failure to pay any other such liability of the undersigned to the holder hereof when the same is due and payable, . . . this note shall in the discretion of the holder hereof become due and payable without notice, anything hereinbefore expressed to the contrary notwithstanding, and the whole or any part or parts of said property, or substitutes therefor and additions thereto may be sold at any time as herein provided at the option of the holder hereof. . . .

"After deducting all legal or other costs and expenses of collection of the note, and of the protection, sale and delivery of the collateral, the residue of the proceeds of any sale or sales may be applied to the payment of this note or of any then existing liability of the undersigned to the holder hereof, whether then due or not, returning the surplus, if any, to the undersigned; and in case of deficiency I agree to pay to the holder hereof the amount thereof forthwith, after such sale with legal interest.

"The holder hereof shall have no duty or liability as to the collection, or protection of any property held as collateral hereunder, or of any income thereon, nor as to the preservation of any rights pertaining

thereto, beyond the safe custody thereof; and the undersigned further agrees that no delay on the holder thereof in exercising any right hereunder shall operate as a waiver of such right, or of any right under this note.''

Moore did not pay the notes, but permitted the People's National Bank and its successor in ownership of notes, the present appellant, to exercise the power of sale contained in notes, and in pursuance thereof said banks from time to time sold cotton in the open markets of Providence, Rhode Island, and after deducting expenses credited the sum realized upon notes. Allowing credits, there was due on notes when suit was brought as balance of principal and interest $398.90, and some storage, insurance and brokerage commission charges. The suit is to recover such sums, and some other charges, which we will not set out, as they have been abandoned. (Throughout this opinion, when we refer to the appellant or plaintiff we mean the original payee of notes, the People's National Bank of Roxbury and the Atlantic National Bank of Boston, since the latter as assignee of notes and pledge took the same subject to any defense that might be interposed as against the original pledgee.)

The defendant in his answer interposed several defenses. Among others, that the plaintiff pledgee of cotton did not exercise ordinary care and diligence as to the time and manner of its sale, or the price at which it should be sold, but negligently retained said cotton until the price thereof had slumped to the point of involving defendant in direct and serious loss; that plaintiff as such pledgee engaged to act in good faith towards defendant and to exercise a reasonable degree of skill and diligence in securing a fair price for cotton, which it did not do, but wilfully and deliberately so handled the cotton as to receive, or

pretend to have received, the lowest market price therefor.

The case was tried by the court with a jury, and at the close of the whole case plaintiff made a motion for an instructed verdict; the basis of such motion being that under the evidence plaintiff was entitled to judgment as a matter of law. This motion was denied, and the court submitted the case to the jury upon the sole questions of plaintiff's negligence, want of skill, and good faith in the handling and disposition of cotton, as raised by the statement in defendant's answer, set out above. All the other issues raised by the answer were either assumed in the instructions to the jury to have been established in favor of plaintiff, or to be without any supporting testimony and withdrawn from the jury.

The defendant also filed a cross-complaint, but no attention was given it in the trial, and neither shall we give it any attention as it presents no question.

Upon the issues submitted, the jury returned a general verdict in favor of the defendant and against the plaintiff's right to recover anything; and judgment was entered accordingly. Plaintiff appeals.

The plaintiff complains of the court's refusal to grant its motion for an instructed verdict at the close of the case; of the admission in evidence, over objection, of a copy of the "Daily News Record," of New York City, dated January 15, 1924, for the purpose of proving market values of Pima cotton during the year 1923; and of instructions given, and the refusal to give a requested instruction.

If at the close of the case the state of the evidence was such as to show that plaintiff was entitled to judgment, the motion for an instructed verdict should have been granted. It is contended by plaintiff that it regularly pursued the power given it by defendant to sell the pledged property, and that there is no

material evidence to the contrary. It appears in evidence that defendant consigned cotton to plaintiff through the agency of the cotton brokerage firm of Calder & Richmond, of Providence, represented locally by one Smith, who solicited the consignment and attended to the details of arranging for advances to be made by plaintiff and the deposit of the cotton and warehouse receipts with plaintiff as security, according to the terms of collateral notes, which defendant admits signing; that the cotton was stored by plaintiff in bonded warehouses in Providence and sold by Calder & Richmond, as agents of the plaintiff, upon the dates and for the prices following: November 1, 1921, one bale, grade No. 2, for 44 cents; August 31, 1922, one bale, grade No. 2 for 36 cents; November 1, 1922, one bale, grade No. 3, for 32 cents; May 17, 1923, one bale, grade No. 3, for 35¼ cents; September 20, 1923, two bales, grade No. 2, for 32¼ cents; and October 2, 1923, one bale, grade No. 1, for 32½ cents.

There is absolutely no testimony whatever that the sales made in 1921 and 1922 were not on the dates they were made for the highest and best prices obtainable. The plaintiff's testimony, and it is not controverted, is to the effect that the pledged cotton was sold at the going prices on those dates. Defendant, accepting this testimony as true, uses it as proof of plaintiff's liability to account to him for all the cotton at 44 cents per pound; that being what was realized for the first bale sold on November 1, 1921. He bases this claim on the fact that he had instructed plaintiff, and its agents, soon after the consignment, to go ahead and sell his cotton, and upon the obvious fact that had it all been sold on that date, at the price obtained for the one bale, more than enough would have been realized to pay all advances made to him by plaintiff. This claim, however, ought not to prevail

for two reasons: First, because on February 21, 1921, defendant, and the local owners of Pima cotton who had also consigned to plaintiff (in all about 6,000 bales), pooled their cotton with the agreement that it should be sold for their account "for such prices, in such amounts and upon such terms and conditions" as a committee designated by them might see fit. The sale of November 1, 1921, as we understand it, was made under the terms of the pool, and as no more than one of defendant's bales was sold, he had accepted that apportionment in advance and of course was bound by it. But if there had been no pooling agreement defendant could not, as a matter of legal right, have insisted upon a sale of the pledged property by the pledgee. While the pledgee in the agreement was given the right to sell at any time or times after the notes were due he was under no legal obligation to do so. The pledgor's only right was to pay his debt and take back his property. By so doing he could have placed it immediately upon the market. Jones on Collateral Securities, 3 ed., § 606.

So far as the sales made during 1921 and 1922 are concerned, there is no evidence tending to show that the plaintiff did not act in good faith towards the defendant, or that it failed to exercise a reasonable degree of skill and diligence in securing a fair price for the cotton.

Bearing upon the question as to whether the sales of cotton made in 1923 were made in good faith and for the going price the defendant was permitted, over plaintiff's objection, to introduce a copy of the "Daily News Record," of New York City, of the issue dated January 15, 1924, containing what purported to be a summary of the weekly price range of Pima cotton and eleven other important types of extra-staple cotton during and for the year 1923. The objection to this evidence was that it was incom-

petent, immaterial and irrelevant; that no proper foundation had been laid for its introduction; and that it appeared to be figures made up by somebody a year after the sales took place.

That copies of newspapers and trade journals containing market reports and price quotations are admissible as evidence to prove market value when an issue seems to be the general rule. The rule in that regard, as stated by Professor Wigmore, is relied upon by plaintiff as sustaining his contention that the "Daily News Record" was improperly admitted, for all the reasons he assigns, whereas defendant cites the same authority to justify its admission. Wigmore's statement of the rule, in his work on Evidence, volume 3, second edition, section 1704, is as follows:

"A printed list of prices at which a class of goods is for sale to any purchaser, or a printed report of the prices obtained at actual sale in an open market, may become trustworthy so far as it is intended to be consulted by all persons who care to know the prices, and has been exposed to a test of accuracy by dealings with such persons on the faith of it, and has further been in their experience found generally reliable (*ante,* section 1702). A price-current list or a market report which fulfills these conditions and has thus sufficed for the correct information of persons who transact commercial operations on the faith of it may well suffice for informing a court of justice. It would not be necessary that the compiler of it should have personal observation of each dealing reported or going to make up the market price reported, because the practical equivalent of personal observation here exists; a report based on direct consultation with dealers or with the officers of an exchange or a market is in commercial circles taken as equally reliable (*ante,* section 719). Such standard price lists and market reports, indorsed by trade experience, ought to be admissible on the principle of the present exception."

29 Ariz.—23

If what the learned author says is read in the light of the reasons for admitting printed lists of prices and printed reports of prices, we think all misunderstanding will readily disappear. The reason is, as is said in *Sisson* v. *Cleveland & T. R. Co.,* 14 Mich. 496, 90 Am. Dec. 252, because such market reports are relied upon by the commercial world; and, as is said in *Mount Vernon Brewing Co.* v. *Teschner,* 108 Md. 158, 16 L. R. A. (N. S.) 758, 69 Atl. 702, because they are accepted by those dealing in the commodity as sufficiently accurate and correct to base their dealings on; and because, as is said by the author, "commercial operations" are transacted on the faith of them. They are accordingly referred to as "price-current lists" and market reports; they are for the information of those persons actually dealing or desiring to deal in the particular commodity; something that is published and distributed to the commercial world contemporaneously with the market and available to the trade for the purposes they are supposed to serve, and not a summary or yearly recapitulation of weekly prices published long after the event of which they purport to be a record.

It is said by defendant, however, that the copy of the "Daily News Record" was properly admitted to prove market value of Pima cotton, because the data it contained was furnished by Calder & Richmond, agents of plaintiff, and the brokers who sold cotton in the Providence market. This contention, if sustained by the evidence, is sound, and we must therefore look into the evidence.

Howard A. Richmond, a member of the firm of Calder & Richmond, testifying, stated that the "Daily News Record," published daily the market report on Pima cotton; that his firm wired such prices to the "Daily News Record" almost every night or business day; that they did so for the year 1923; that they

did this to hold the price of Pima cotton up; that the quotations were the prices asked. On cross-examination he said:

"I am not responsible for those figures on that table (the 'Daily News Record' summary). I don't know who made them up or from what authority they came."

In another place he says:

"These market reports were not supposed to be what the cotton was sold for; they were supposed to be the asking price. . . . I don't know what this table says. We quoted the asking price. I don't know anything about that table. I did not say we furnished figures for that table."

This testimony does not show where or how the "Daily News Record" got the figures used in the summary. It does not purport to be a republication of the prices furnished it by Calder & Richmond. Whether the compiler used in his recapitulation or summary the figures sent to the "Daily News Record" by that firm can only be conjectured. It does not appear why it was published or what purpose it sought to serve. It was not news of the market of which the business and trading world could take advantage. We think the fact that the daily quotations in such paper were the asking price shows that they are not entitled to credit as evidence of value, and a summary made from such asking price would be as equally unworthy of credence. There is nothing in the record, however, to show the sources of the summary, and it affirmatively appears that it was not accepted and relied upon, and could not be, by the trade in the ordinary course of business. So far as we are advised, no court has ever been called upon to consider this question. Wherever the question of the admissibility of market reports and price quotations as contained in newspapers and trade jour-

nals has arisen, it has been of the issues of such papers in the regular course of business, and it has appeared that the trade has accepted and relied upon the information obtained therefrom in the transaction of business. It is deemed in such cases that the evidence is highly proper and trustworthy. 10 R. C. L. 1167, § 367; 22 C. J. 188, § 152. In this instance we are asked to extend the hearsay rule to include a summary of current prices and quotation reports published some months after the date of the market supposed to be covered, shown to be the asking price or compiled from undisclosed and uncertain sources. We feel to do so would be extending the rule too far.

We are of the opinion the court erred in the admission of this evidence, and without it the defendant's contention with reference to the sales made in 1923 is in the same condition as those made in 1921 and 1922—without any support in the evidence. The court should have granted the plaintiff's motion for a directed verdict.

This disposition of the case makes it unnecessary to pass upon the other assignments.

This is another of a series of cases we have had before us that grew out of the debacle in cotton prices in 1921–1923. It should be borne in mind plaintiff is no more responsible for the falling market for Pima cotton than defendant. It has long been apparent that defendant would have done better had he sold his cotton in the Phoenix market than he did by consigning it to plaintiff. In October, 1920, Pima cotton was selling for 60 cents per pound, but defendant wanted more and took his chances. When his cotton reached the east the market was on the decline, and it continued to decline for a long time. Because the plaintiff perchance, did not possess the power to look into the future and foresee the oncoming crash in cotton prices, or because it may have

made a sale at a time which if it had made at another time (a few days or months earlier) more would have been realized, it should not be charged with the loss. The loss seems to have been due to a business mistake that no one has prescience enough to avoid.

Since plaintiff was entitled to judgment under the evidence adduced at the trial, the judgment is reversed and the cause remanded, with directions that judgment be entered for plaintiff.

McALISTER, C. J., and LOCKWOOD, J., concur.